STATE OF IOWA, EX REL., CHAS W. MULLAN, Atty. Gen., Appellant, v. THE SYNDICATE LAND COMPANY, Appellee.

**Corporations:** FRAUD: VIOLATION OF STATUTES: DISSOLUTION: RECEIVER. Where a corporation, organized among other things to deal in real estate and invest money therein for others, has violated the provisions of Code sections 1620 and 1621, by deceiving the public and individuals as to its means or liabilities; has diverted the funds of investors and acted illegally in the issuance of installment land contracts, by failing to comply with the statutes requiring it to procure a certificate from the auditor authorizing it to do business, and to deposit with such officer the required securities; and it has no substantial business other than its land contract business, it should be dissolved and its affairs wound up through the medium of a receiver at the suit of the State, in the

absence of a showing that creditors and stockholders can not be protected upon its dissolution.

*Appeal from Polk. District Court.*—Hon. A. H. McVey, Judge.

THURSDAY, MARCH 18, 1909.

Suit in equity, brought by the State, on the relation of the Attorney General, to wind up the affairs of the defendant, a corporation organized under the laws of this State, for the appointment of a receiver, and for other equitable relief. The trial court found that the corporation had been acting beyond its powers and illegally, but that it was also engaged in a large legitimate business which would be ruined by the appointment of a receiver. It decreed that the defendant abandon its illegal business, but denied the application for a receiver. The State appeals. —*Reversed* and *remanded.*

*H. W. Byers,* Attorney General, and *George Cosson,* Assistant Attorney General, for the State.

*Henry & Henry* and *Hager & Powell,* for appellee.

Deemer, J.—Defendant is a corporation organized under chapter 1, title 9, of the Code; its object being, as stated in its articles: "To acquire, purchase, take and hold real estate and personal property, whether for its own use or to protect existing interests therein, or for other purposes; and to mortgage, lease, sell and convey the same; to negotiate, purchase, hold and sell mortgages, stocks, bonds and other securities and personal property; to invest money in real estate for itself and for other parties; to loan money; to accept and execute such trusts as may be committed to it by any individual company, corporation, partnership, as-

sociation, organization or court; to receive money for investment or other purposes; to issue debentures or bonds, which may be secured by pledge of any of the assets of the corporation; to act as agent, trustee, executor, administrator or guardian, assignee, or receiver, as may be now or hereafter authorized by law in any State or country in which it may carry on its business, and it shall have all powers necessary for the carrying out of these objects, now or hereafter conferred on such corporations by law." It was incorporated November 27, 1901, and entered upon the discharge of its functions. The State, on the relation of its then Attorney General, brought this suit charging:

That defendant had issued a large number of installment land contracts aggregating several thousand. That the holders of said contracts have paid large sums of money thereon to the defendant corporation. That said contracts have never been cancelled or redeemed by said corporation. That upon the passage of chapter 66, Acts 30th General Assembly 1904, the defendant corporation failed to comply with the provisions of that act, and failed to deposit with the auditor of state a bond, approved by the executive council, for the faithful performance of all the contracts entered into by the corporation, or other securities approved by the executive council, in the amount of $25,000, or in any other amount whatever, and wholly failed at the end of the calendar year following the passage of said act to deposit with the auditor of state of the State of Iowa securities of the kind provided in said act equal to all of the liabilities of the corporation to persons residing in the State, and wholly failed to keep a deposit of such securities with the auditor of state, as provided in section 6 of said act. That defendant corporation had printed upon its letter heads, envelopes, and upon the books and pamphlets sent out to the public, the following statement: 'Incorporated under the laws of Iowa. Capital stock $1,000,-000.' That the officers and agents of the defendant corporation solicited various persons through the State to enter into land contracts, and represented to said persons that

the corporation had a capital stock of one million dollars, and that it had large securities deposited with the auditor of state of the State of Iowa.    That the said agents exhibited to said persons the statements heretofore referred to upon the printed pamphlets, folders, and stationery—all for the purpose of inducing said persons to believe that the defendant corporation was actually possessed of a capital of one million dollars, and that the said defendant corporation had proper securities deposited with the auditor of state. That the oral statements made by the defendant's agents and the representations made upon the authorized and official stationery of the said defendant did cause a large number of persons within this State to believe that the said defendant had a capital of one million dollars, and that it had securities deposited with the auditor of state, and, relying upon said statements and said representations, said persons were induced to take out installment land contracts with the said defendant and to pay said defendant large sums of money thereon.    That the representations, both oral and written, made by the said defendant, were false, and known by the defendant to be false, and that a large number of individuals relied upon said false statements and representations to their injury.    That the defendant corporation by its officers was guilty of intentionally and wrongfully diverting the funds of the corporation and appropriating large sums to themselves and charging an excessive amount of expenses to the contract holders.

The plaintiff, in an amendment to its petition, alleged:

That one Wm. Wilkinson, one Alexander MacRae, and one B. C. Bowman purchased a large tract of land in the Dominion of Canada and paid thereon but a small part of the purchase price; the remaining part of the purchase price being an incumbrance thereon.    That thereafter the said parties organized the Syndicate Land Company and were made the officers and directors of said corporation and had the sole management thereof.    That the said Wilkinson, Bowman and MacRae held a meeting of the board of directors, and by a resolution, acting on behalf of the corporation, they purchased the aforesaid tract of land from themselves, acting for themselves as grantors in an

individual capacity, and acting for the corporation in a representative capacity as purchasers. That the said Wilkinson, Bowman and MacRae passed a resolution, as the board of directors of the defendant corporation, that said corporation should issue to the said Wilkinson, Bowman and MacRae $98,000 of the stock of said corporation and execute and deliver to them the obligation of said corporation to pay to the said Wilkinson, Bowman and MacRae the sum of $63,000 in cash for the land contracts assigned by them to said corporation. That the said Wilkinson, Bowman and MacRae, as directors of said corporation, issued to other persons certificates of stock amounting in the aggregate to about the sum of $12,000, and that the land contracts so assigned and transferred to said corporation by the said Wilkinson, Bowman and MacRae, and the $12,000 paid for the certificates of stock issued to other persons as aforesaid, constituted the entire assets of such corporation. That sixty per cent. of the entire amount of money received upon said land contracts was appropriated to other purposes by the managing officers of the defendant corporation and was not invested in lands according to the written, printed and oral statements made by the officers and agents of said defendant.

Defendant admitted that it had entered into installment land contracts, admitted that it had failed to comply with the requirements of chapter 66 of the acts of the Thirtieth General Assembly, but claimed that the act was never constitutionally adopted, and denied the other allegations of the petition and the amendment thereto. On these issues the case was tried to the court, resulting in the decree hitherto stated.

That the case may be properly understood, we here quote the applicable provisions of the statute (Code):

Sec. 1620. Intentional fraud in failing to comply substantially with the articles of incorporation, or in deceiving the public or individuals in relation to their means or their liabilities, shall be a misdemeanor, and shall subject those guilty thereof to fine and imprisonment, or both, at the discretion of the court. Any person who has sus-

tained injury from such fraud may also recover damages therefor against those guilty of participating in such fraud.

Sec. 1621. The diversion of the funds of the corporation to other objects than those mentioned in its articles and in the notice published, if any person be injured thereby, and the payment of dividends which leaves insufficient funds to meet the liabilities thereof, shall be such fraud as will subject those guilty thereof to the penalties of the preceding section; and such dividends, or their equivalent, in the hands of stockholders, shall be subject to such liabilities. If the directors or other officers or agents of any corporation shall declare and pay any dividend when such corporation is known by them to be insolvent, or any dividend the payment of which would render it insolvent, or which would diminish the amount of its capital stock, all directors, officers or agents knowingly consenting thereto shall be jointly and severally liable for all the debts of such corporation then existing, but dividends made in good faith before knowledge of the occurring of losses shall not come within the provisions of this section.

Sec. 1622. Any intentional violation by the board of directors or the managing officers of the corporation of the provisions of the two preceding sections shall work a forfeiture of the corporate privileges, to be enforced as provided by law. If the indebtedness of any corporation shall exceed the amount of indebtedness permitted by law, the directors and officers of such corporation knowingly consenting thereto shall be personally and individually liable to the creditors of such corporation for such excess.

Sec. 1640. Courts of equity shall have full power, on good cause shown, to dissolve or close up the business of any corporation, and to appoint a receiver therefor, who shall be a resident of the State of Iowa. An action therefor may be instituted by the attorney general in the name of the State, reserving, however, to the stockholders and creditors all rights now possessed by them.

Section 1, 2, 3, 4, 6 and 7, chapter 66, Acts 30th General Assembly 1904, read as follows:

Section 1. The term 'association' when used in this act shall mean any person, firm, company, partnership, as-

sociation or corporation, other than building and loan associations and insurance companies and associations, which issue stock on the partial payment or installment plan. The term 'issue' shall mean issue, sell, place, engage in or otherwise dispose of or handle. The term 'stock' shall mean certificates, memberships, shares, bonds, contracts, debentures, stocks, tontine contracts, or other investment securities or agreements of any kind or character issued upon the partial payment or installment plan.

Sec. 2. No association contemplated by this act shall issue any stock until it shall have procured from the auditor of state a certificate of authority authorizing it to engage in such business. To procure such certificate of authority it shall be necessary for such association to file with the auditor of state a statement, under oath, showing the name and location of such association, the name and postoffice address of its officers, the date of organization, and if incorporated a copy of its articles of incorporation, also, a copy of its by-laws or rules by which it is to be governed, the form of its certificates, stocks or contracts, all printed matter issued by it, together with a detailed statement of its financial condition and such other information concerning its affairs or plan of business as the auditor of state may require. The same shall be, by the auditor of state, laid before the executive council for consideration.

Sec. 3. If the executive council is satisfied that the business is not in violation of law or of public policy, and is safe, reliable and entitled to public confidence, and if it shall approve the form of certificate of stock or contract, it shall direct the auditor of state to issue to such association a certificate of authority authorizing it to transact business within this State until the first day of March next succeeding the date of such authorization.

Sec. 4. Every such association at present transacting within this State, the business contemplated by this act, shall be subject to all the provisions hereof, and shall within sixty days from the taking effect of the same, comply with all of its requirements.

Sec. 6. Before any association shall be authorized to transact business contemplated by this chapter, it shall deposit with the auditor of state a bond approved by the

executive council, guaranteeing the faithful performance of all contracts entered into by such association or securities of the kind designated in subdivisions one, two, three, four and five of section eighteen hundred and six of the Code, as amended by chapter sixty-six (66), acts of the Twenty-Eighth General Assembly, 1900, or such other securities as shall be approved by the executive council in the amount of twenty-five thousand dollars, which amount shall remain in possession of the auditor of state until the end of the calendar year in which the association shall first be authorized to transact business. At the end of such calendar year, such association shall deposit with the auditor of state securities of the kind above provided in an amount equal to all its liabilities to persons residing within this State and shall keep such deposit at all times equal to such liability; provided that at no time shall such deposit be reduced below twenty-five thousand dollars except at such time as such association shall be by law closing out its business and its liabilities shall have been reduced below twenty-five thousand dollars.

Sec. 7. Any member or representative of any association who shall attempt to issue or sell any stock as contemplated by this act or to transact any business whatever in the name of or on behalf of such association, not authorized to do business within this State, or which has failed or refused to comply with the provisions of this act, or has violated any of its provisions shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by imprisonment in the county jail not to exceed one year, or by a fine of not less than one hundred nor more than one thousand dollars or by both such fine and imprisonment in the discretion of the court.

There is no claim that defendant in any manner complied with the provisions of this act; but it is insisted that it issued no installment land contracts after July 4, 1904, save one on the 11th of that month, and that this one was issued through inadvertence. There can be no doubt under the evidence that the defendant corporation intentionally issued circulars and statements with reference to its business which were false and untrue.

For instance, it stated: That its capital stock was $1,000,-000; that it offered opportunities for land investment, the safest security on earth; that it had $100,000 deposited with the auditor of state, and would guaranty a return of from ten to fifteen per cent. upon the money invested. In one of its booklets is found the following statement: "Contracts carried to maturity are settled for in cash or land at the option of the holder, the amount paid in, an amount equal to fifty per cent. of the same additional, and half of all net profits made in excess of fifty per cent. being paid to the investor, the company retaining the balance as its share." One of its agents stated that the company guaranteed a return of ten per cent. on investments made with the company. It is true that the authorized capital stock of the defendant company according to its articles was $1,000,000, but it was authorized to commence business when $50,000 should have been subscribed. It never had any deposit with the state auditor and never had a guaranty fund. Various other misrepresentations are said to have been made to which we shall hereafter make reference. The defendant was organized by Wilkinson, MacRae and Bowman, who were theretofore doing business under the name of the American Realty Company. These parties held contracts for Canada lands upon which they had made some payments, and these were assigned to the defendant after its organization for the sum of $98,000 in the stock of the defendant company. Upon the land contracts so assigned something like $50,000 was due which was to be paid by the assignee. They had paid but $13,000 on these land contracts when they were turned over, but they received $98,000 in stock and $63,000 in the obligations of the company. There never was more than $12,000 paid in in cash to the company, and when this action was tried no one seemed to know whether there was any cash on

Some time prior to May of the year 1904, defendant acquired the business of what was known as the "Western Land Investment Company." This company was issuing what were known as "installment land contracts," and upon the purchase of the investment company's assets defendant began the same line of business. These contracts gave to the purchaser the right to receive a certain number of acres of land or a certain amount in money at a given date, provided the purchaser paid a given number of installments at certain times, and contained rigid terms of forfeiture. The installments were to be paid partly in cash and partly by notes. It was also provided that, if a purchaser permitted his contract to lapse before three annual payments were made, he should forfeit all that he had paid. As we understand it, but eight hundred acres of land were set aside for the fulfillment of those contracts. Although the company received from $12,000 to $15,000 on these contracts, it credited not more than $7,000 to the purchasers; the remainder being used for commissions and expenses. The company purchased lands at $5 or less per acre and sold them under these contracts at about $12.50 per acre, and a very large percentage of the returns was used for the expenses of the company. The officers of defendant did not know at the time of trial how much money there was in the company's hands which had been received on these land contracts and from any other source. The defendant never undertook to comply with chapter 66, Acts 30th General Assembly 1904, before quoted. On the contrary, it continued to receive money on its land contracts down to the day of trial, and, as we have said, issued one at least after July 4, 1904, although it may perhaps be said that this was done through inadvertence.

There can be no doubt under this record: That, in so far as the installment contracts are concerned, defendant has been acting illegally; that it never complied with

the acts of the Thirtieth General Assembly; that it misled the public as to its capital, its assets, and its securities; and that the money it received was not invested in accord with its advertised plan. It purchased lands for $5 or less per acre and sold them at $12.50, and its expenses have been out of all proportion to its revenues. The trial court came to practically these same conclusions, but it also found:

That the company has done a large general business outside of this particular feature, and that a receivership would be disastrous to the general business of the defendant company, and the court has no desire to embarrass the general business of the company; but I am clearly of the opinion that the installment contract investors should be protected, and that they are entitled to a return of the cash which they intrusted to the defendant, or to its investment in lands at the price for which they could have been bought in the market at the time of the respective subscriptions, and that the expenses incident to the carrying on of this department of the business is entirely too much. The court is of the opinion that a receiver should be appointed to take charge of the business of the defendant company, unless a sufficient quantity of lands at a reasonable price can be set apart for the protection of these investors and the expenses incident to the investment reduced to a reasonable sum. If such an arrangement can be made, the receivership will be denied; otherwise, the receiver will be appointed.

It does not appear that these arrangements were made, but, in any event, the prayer for the appointment of a receiver and for the winding up of the corporation was denied.

We, perhaps, should further refer to some of the pointed statements made by the defendant to show its intent to deceive. Some of these we here copy:

We are compelled by the provisions of our contract to invest the money of our contract holders in exactly

the same manner that we do our own, and every precaution is taken to insure safety and profit. The provision of the contract relative to investment being complied with, and the money invested in land, it is certain that it can not get away, and the investor has real estate security for his investment, commonly held to be the best of all securities. Every contract with the investor provides that the money received from him must be invested as carefully and conscientiously, and in exactly the same manner, as they invest their own. They can not in any way shirk the responsibility without making themselves criminally liable, and, as already stated, it will be more profitable to be honest than otherwise. In short, there is only one thing that could cause an investor to lose his money in this proposition, namely, if the officer who handles the money should steal it and fail to invest it in the lands as agreed, then you would lose. That, of course, applies to any proposition where other people handle your money. To protect the interest of our investors and throw every safeguard possible about our investments, the company has, in addition to its regular directory, an advisory board nominated and elected from among its stockholders and contract holders, and composed of bankers and first-class business men from various localities, selected for their qualifications and judgment as regards investments. From the members of this board the management selects committees to examine into and pass upon the merits of any proposed purchase, if of sufficient magnitude to warrant it, so supplementing the judgment of the management with the judgment of the contract holders, and thus assuring, so far as possible, careful, conservative and profitable buying.

The sole question under the issues is: Should the corporation be wound up and a receiver appointed to take charge of its business? In *Platner v. Kirby,* 138 Iowa, 259, we had occasion to consider section 1640 of the Code, and in that case we said:

The substantial effect of the section (1640) therefore is to authorize the Attorney General to maintain a

suit in equity in the name of the State to wind up the corporation on account of some violation by it of the laws of the State or other such action as involves a violation of this chapter. (Chapter 1, title 9, of the Code.) . . . The legislative intent seems to have been to authorize what was not previously authorized with reference to corporations in general, an action in equity by the Attorney General in the name of the State and in the interests of the public to dissolve a corporation on account of violation by it of the laws of the State, and to leave to the stockholder such remedy as he already had.

The record shows a violation of sections 1620 and 1621 of the Code, and there is no showing that creditors and stockholders may not be protected upon a dissolution of the corporation. Moreover, there can be no doubt that it was the intention of the Legislature to wind up all such associations as were engaged in the business of issuing investment securities on the installment plan, provided they did not comply with the provisions of chapter 66 of the acts of the Thirtieth General Assembly within sixty days from the passage of the act. See sections 4 and 7 of the act. Defendant did not comply with this act and there is no showing that it had any other substantial business. True it bought and sold some land, but it does not appear that at the time this suit was brought it had enough funds to pay out on its installment contracts then outstanding. There can be no doubt of the right of the state to wind up any corporation which it has created, and that it was the intention of the Legislature to do so there is no question. We think there should have been a decree winding up the corporation, and that a receiver should have been appointed as prayed.

The decree will be reversed, and the cause remanded for one in harmony with this opinion.—*Reversed* and *remanded.*